Judith I. WALBORN, Plaintiff–Appellant,

v.

ERIE COUNTY CARE FACILITY,
et al., Defendants–Appellees.

No. 97–3678.

United States Court of Appeals,
Sixth Circuit.

Argued June 15, 1998.

Decided July 30, 1998.

Paul S. Goldberg (argued and briefed), Goldberg & Wurster, Toledo, Ohio, for Plaintiff–Appellant.

Joan C. Szuberla, Spengler Nathanson, P.L.L., Toledo, Ohio, Terry Griffith (briefed), Office of the Prosecuting Attorney for the County of Erie, Civil Division, Sandusky, Ohio, for Defendants–Appellees.

Before: KENNEDY, GUY, and NORRIS, Circuit Judges.

## OPINION

KENNEDY, Circuit Judge.

Plaintiff Judith Walborn appeals from the District Court's order granting summary judgment in favor of defendants Erie County Care Facility ("ECCF") and its officers in this action alleging employment discrimination. Ms. Walborn claims that defendants retaliated against her for filing an administrative complaint with the Equal Employment Opportunity Commission ("EEOC")

and a subsequent claim in the District Court pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. On appeal, Ms. Walborn contends that summary judgment was improper because genuine issues of material fact exist. We disagree and **AFFIRM** the judgment of the District Court.

## I. FACTS

Plaintiff Judith Walborn began working at the Erie County Care Facility on November 16, 1987 as a Licensed Practice Nurse. The ECCF is a nursing home located in Sandusky, Ohio which employs more than fifteen employees and which is owned and operated by the Board of County Commissioners of Erie County.

### A. *Procedural History*

Ms. Walborn first sued ECCF in January 1995. In that action, she claimed that ECCF violated the ADA as well as the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq. by refusing to limit her work assignment to the two non-smoking work areas.[1] Defendant ECCF moved for summary judgment. The District Court granted the motion on April 13, 1996 on the ground that ECCF had reasonably accommodated Ms. Walborn's disability. Ms. Walborn did not appeal this ruling.

Ms. Walborn later filed the instant action against ECCF and its officers. In this suit, she alleges that defendants violated her rights under the ADA by retaliating against her for requesting reasonable accommodation and bringing the first lawsuit. Defendants again moved for summary judgment. The District Court issued an order granting the motion, finding that Ms. Walborn had failed to establish a prima facie case of retaliation. Specifically, the court found that no causal link existed between the alleged instances of retaliation and Ms. Walborn's request for a reasonable accommodation. Ms. Walborn then filed a timely notice of appeal.

1. ECCF was divided into four work areas or "clusters."

2. Aides from the night shift had complained that Mrs. Walborn would hold up signs rather than

### B. *Factual History*

On March 30, 1992, Harry VandeVelde became the new administrator of ECCF. Shortly thereafter Cyd Jameyson became the new Director of Nursing. Because Jameyson perceived several problems among Care Facility staff members upon her arrival, she decided to meet with Ms. Walborn to address her concerns as they related to Ms. Walborn. The meeting took place on July 6, 1992. Jameyson testified that during this meeting she primarily discussed Ms. Walborn's paperwork and treatment of the nurses' aides under her supervision. Other staff members who worked on Ms. Walborn's shift had complained to Jameyson that Ms. Walborn was doing minimal paperwork, requiring others to "carry her load," and that she treated the nurses' aides disrespectfully.[2]

Jameyson also testified that she viewed the meeting as merely a talking session designed to help her get acquainted with Ms. Walborn and advise her of ECCF's expectations of her. Jameyson specifically stated that she therefore made no accusations against Ms. Walborn during the meeting. Ms. Walborn and her husband, however, came away with a different impression, describing the encounter as a "rape meeting." Mr. Walborn became intent on securing an apology from VandeVelde, Jameyson's supervisor. In addition, he wanted to let VandeVelde "know that he kicked the wrong dog and that [Ms. Walborn and I are] quality people and don't try and continue on this course because I'm going to keep a record on every move you make." Accordingly, he phoned VandeVelde and arranged a meeting.

On July 27, 1992, the Walborns met VandeVelde in a local park. During the meeting, Mr. Walborn complained that there was a faction of troublemakers at ECCF who spread untruths about various individuals that would filter to the administration. The administration, according to Mr. Walborn, would treat these rumors as facts and wrongfully "prosecute" the accused without provid-

speak to them and would throw trash in the middle of the floor with the expectation that the aides would clean up the mess.

ing them a genuine opportunity to vindicate themselves. Before leaving the park, Mr. Walborn gave VandeVelde a list of the "known ECCF troublemakers" as well as a list of suggestions.

After the July 6 meeting, the Walborns began to take notes recording everything that happened at ECCF. By the end of 1996, they had amassed sixteen loose leaf notebooks of typed documents and notes. The couple also fielded phone calls from other dissatisfied employees. In his deposition, Mr. Walborn described their family room as the "mission control center" for information critical of ECCF administrators and their supporters.

Ms. Walborn and her co-worker Patty Powell arranged a meeting with Erie County Commissioner Tom Ferrell. This meeting was followed by another meeting attended by three County Commissioners and five Care Facility nurses. The nurses criticized the VandeVelde administration and complained that ECCF was poorly run. Ms. Walborn testified that she had expressed concerns about chain of command issues.[3] Following both of these meetings, the Board of County Commissioners met with other members of the ECCF nursing staff. These nurses informed the Board that they believed Ms. Walborn and the other complaining nurses were unfairly criticizing Jameyson.[4]

On February 11, 1993, Ms. Walborn requested that Jameyson reassign her from Cluster 3, the cluster in which smoking is permitted, because she suffered from various breathing disorders. Jameyson granted the request after Ms. Walborn provided the requisite doctor's slip substantiating her need for an accommodation. However, Ms. Walborn complains that ECCF took the following adverse actions against her in order to retaliate against her for asserting her rights under the ADA.

1. *The Sexual Harassment Complaint*

Ms. Walborn maintains that on December 3, 1993, ECCF improperly disciplined her for sexual harassment. The incident which formed the basis for the discipline involved a male nurse, Tony Lilje, whom Ms. Walborn supervised two nights in late fall, 1993. Lilje testified that on the first night he worked under Ms. Walborn's direction, she told Lilje an intimate story of a sexual nature.[5] Lilje explained that although he was not "offended" by the discussion, he felt such talk was inappropriate in the workplace. He reported the incident to his supervisor who assured him that he would not need to work under Ms. Walborn again. The supervisor then advised Jameyson of the incident.

Approximately one week later, Lilje wrote a two-page report summarizing the two evenings he worked under Ms. Walborn's supervision. Lilje explained his actions, stating that he was concerned "things would get twisted" and that he would be blamed for having said inappropriate things. He testified that rumors suggesting that Ms. Walborn was unstable heightened this concern.

Upon learning of Lilje's complaint, Jameyson investigated the allegations. After witnesses verified Lilje's account, Jameyson conducted a counseling session[6] with Ms. Walborn. Maria Kirkwood, Ms. Walborn's union representative, attended this meeting.

Ten months after the counseling session, in September, 1994, Lilje reported another incident. On September 6, 1994, Mr. Walborn phoned Lilje at home because he and his wife were "100% convinced" that Lilje had been forced to write the sexual harassment report against his will. Mr. Walborn testified that he and his wife had discussed the call before he made it. He further testified that the conversation was friendly and low-key.

---

**3.** Ms. Walborn also testified that these problems began prior to the advent of the VandeVelde administration.

**4.** It is important to note that ECCF employees are unionized and that the record in this case reveals that much union in-fighting took place during the VandeVelde administration.

**5.** Ms. Walborn denies Lilje's version of the events. She acknowledges that she supervised Lilje on two evenings in late fall, 1993 and that she has recounted a story similar to the one about which Lilje complained. However, she denies ever having told the story to Lilje.

**6.** Pursuant to ECCF's collective bargaining agreement, a counseling session is not discipline.

However, Lilje testified that Mr. Walborn had threatened to sue him for slander and indicated that the call had frightened him. (J.A. 236–37)

Lilje reported the call to Jameyson and the Assistant Erie County Prosecutor Terry Griffith on September 7, 1994. That night, Ms. Walborn's friend, Patty Powell, phoned Lilje at home, requesting him to talk to the Walborns about the incident. Lilje testified that he did not want the Walborns or Powell to call him again and therefore changed his phone number.

The Walborns then sent a letter signed by Ms. Walborn to Griffith, the Assistant Prosecutor who advises ECCF on personnel matters. In the letter, she demanded to face Lilje, examine him and call witnesses.

They also sent a letter signed by Ms. Walborn to Lilje. This one stated that Lilje had put "an ugly stain on [Ms. Walborn's] reputation." It suggested that Lilje and his wife meet the Walborns at a park "to openly discuss this ugly matter." The letter concluded:

> As Rich has indicated, we will file legal charges against you this coming week, if you do not step forward. Your story can be told under oath in court, in deposition or in the park. If legal charges are filed, you will be on your own ... The choice is yours. Call me and talk or face litigation.

Lilje gave the letter to Jameyson, who turned the matter over to VandeVelde. VandeVelde arranged a meeting among Jameyson, two county officials, Lilje and himself. The county officials interviewed Lilje regarding his conversation with Mr. Walborn and confirmed the Walborns' joint involvement in the matter.

Next, VandeVelde summoned Ms. Walborn to a pre-disciplinary conference to face charges that she had attempted to intimidate and threaten a fellow employee. Ms. Walborn's counsel represented her during this hearing. Following the hearing, the Board of County Commissioners suspended her for three days without pay.

### 2. The Oral Reprimand for Absences

On January 4, 1994, Ms. Walborn received an oral reprimand for being absent from work on three occasions over a three-month period without a physician's excuse. She acknowledges that she did not have a doctor's excuse for any of the absences. A number of other employees were reprimanded for similar conduct on that day.

### 3. The Medical Documentation Requirement

On March 5, 1994, Ms. Walborn submitted a written request that she be assigned to only two of four of the Care Facility clusters. VandeVelde, upon receiving the letter, requested that she consult an allergist and provide medical documentation of her condition and her ability to return to work. On March 15, 1994, Ms. Walborn submitted a doctor's slip indicating that she could return to work June 1, 1994.

Then, on May 2, 1994, VandeVelde received another letter from Ms. Walborn requesting permission to return to work the following day. VandeVelde sent a reply, dated May 3, which acknowledged receipt of her request as well as a note from the allergist permitting her to return to work on May 3, 1994 without restrictions.

### 4. The Notice of Voluntary Resignation

On November 4, 1994, Ms. Walborn, or someone on her behalf, notified Judy Mize, an ECCF office employee, that she would be under a doctor's care until early January, 1995. Ms. Walborn also submitted a doctor's slip indicating that she would be unable to work due to illness from November 1, 1994 until January 2, 1995. Due to a clerical error, the letter was never placed in her personnel file. Consequently, on December 1, 1994, VandeVelde sent Ms. Walborn a letter stating that since ECCF had not heard from her since she phoned in sick in early November and had no explanation for her absence, it considered her a voluntary resignee effective December 1, 1994. Upon learning that a mistake had been made, VandeVelde immediately issued a reinstatement letter, dated December 5, 1994.

### 5. *The Undesirable Holiday Work Schedule*

Ms. Walborn also complains that she was only one of two employees scheduled to work nine consecutive days during the holidays in 1994. Another employee, Patty Powell, had a similar schedule. She complained about both of their schedules and ECCF revised them. The clerical employee who drafted the schedules testified that she processes slips for holiday scheduling on a "first come first served basis" and that she was unaware that Ms. Walborn had ever been scheduled for holiday work unfairly. Ms. Walborn was on medical leave during the entire holiday period; she neither spoke with anyone at ECCF about her holiday schedule, nor did she work any days over the holidays.

### 6. *Notice of Pre-disciplinary Hearing for Improper Paperwork*

Finally, Ms. Walborn complains that she was unfairly scheduled for a pre-disciplinary hearing for improper paperwork. She testified that on April 14, 1995 she was alone in a cluster when she heard a call for help. When she responded to the call, she found a resident sitting on the floor of her room, quickly assessed her, and helped her into bed. The resident's roommate had called for help.

Normal procedure is to chart or memorialize any unusual event, to inform the R.N. supervisor of the incident, and, if no injury occurred, to notify the doctor and family the next morning. Such documentation is a federal requirement. Ms. Walborn testified that she simply forgot to do the paperwork, tell her supervisor or make the requisite phone calls. However, sometime after the incident occurred, Ms. Walborn made a "late entry" documenting the fall.

On May 18, 1995, ECCF summoned Ms. Walborn for a pre-disciplinary hearing based on her failure to follow the required documentation procedures. At that time, neither the ECCF administration nor its legal counsel were aware that Ms. Walborn had made a "late entry." When the administration learned that she had entered a "late entry," they canceled the pre-disciplinary hearing. Ms. Walborn contends that this and each of the incidents beginning in February, 1993 establish a pattern of retaliation designed to punish her for asserting her rights under the ADA.

## II. DISCUSSION

■■■■ This Court reviews the District Court's decision to grant summary judgment de novo. *Tolton v. American Biodyne,* 48 F.3d 937, 941 (6th Cir.1995). Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if the complainant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This Court must construe the evidence, as well as any inferences which reasonably could be drawn therefrom, in the light most favorable to the party opposing the summary judgment motion. *Kraus v. Sobel Corrugated Containers,* 915 F.2d 227, 229 (6th Cir.1990). We may conclude that no genuine issue for trial exists only if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party...." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In this case, Ms. Walborn contends that summary judgment was inappropriate because the record reveals a genuine issue of material fact regarding whether ECCF retaliated against her for asserting her rights under the ADA. The ADA prohibits an employer from retaliating against an employee because the employee engaged in protected activity:

No person shall discriminate against any individual because such individual has opposed an act or practice made unlawful by this chapter or because such individual has made a charge or because such individual testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).

■■■■ To prove a claim for retaliation, a plaintiff must demonstrate: that she engaged

in protected activity; that the exercise of her civil rights was known by the defendant; that defendant thereafter took adverse employment action; and that a causal connection exists between the protected activity and the adverse employment action. *Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987). In her attempt to establish a prima facie case of retaliation, Ms. Walborn recounts numerous allegedly adverse actions taken against her after she sought a reasonable accommodation under the ADA and filed a charge with the EEOC. However, Ms. Walborn fails to establish the requisite causal connection between the alleged incidents of retaliation and the protected activity. *Zanders v. National R.R. Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir.1990) (requiring plaintiff to produce evidence "sufficient to raise the inference that her protected activity was the likely reason for the adverse action").

As the District Court noted in its opinion, Ms. Walborn's case suffers from an initial weakness. Ms. Walborn alleges retaliatory conduct that preceded her accommodation request and EEOC charge. She testified that she believes she has been treated unfairly since July 1992, nearly a year before she requested a reasonable accommodation and two years before she filed her EEOC complaint. Thus, Ms. Walborn does not allege that ECCF has treated her differently since she asserted her rights pursuant to the ADA.

The fact that some of the allegedly retaliatory actions took place after Ms. Walborn filed an EEOC charge is insufficient to establish the requisite causal connection. *See Cooper v. City of North Olmsted,* 795 F.2d 1265, 1272 (6th Cir.1986) (requiring direct evidence linking the employer's issuance of citation to the protected activity where an employee is cited for work violations both before and after engaging in protected activity). Moreover, an employee's work violations constitute a legitimate, nondiscriminatory reason for adverse employment decisions.

Turning to the specific acts of retaliation, it becomes even clearer that Ms. Walborn's case must fail. Ms. Walborn complains of the following adverse employment actions: (1) an allegedly false charge of misconduct bordering on sexual harassment against a co-worker; (2) alleged intimidation of that co-worker in order to persuade him to retract his story; (3) an oral reprimand for unexcused absences; (4) an erroneous notice of termination; (5) the requirement of a doctor's permission to return to work; (6) an undesirable holiday schedule in 1994 while she was on medical leave; and (7) scheduling an unjustified disciplinary hearing for failing to comply with ECCF's documentation requirements. The record persuades us that the evidence does not permit the inference that ECCF took these actions in retaliation for Ms. Walborn's protected activity.

First, Ms. Walborn contends that the alleged misconduct against Lilje was fabricated at the instigation of ECCF supervisory personnel. However, the record contains absolutely no evidence to support this contention. To the contrary, the record reveals that it was Lilje who approached the administration and that the administration verified his version of events before it called the counseling meeting.

Second, the record is clear that a reasonable employer would conclude that Ms. Walborn did intimidate Lilje in an attempt to convince him to change his story. The letter signed by Ms. Walborn speaks for itself. Therefore, Ms. Walborn's contention that the resulting three-day suspension was retaliatory is meritless.

Third, Ms. Walborn contends that the oral reprimand for three unexcused absences within three months was retaliatory. However, she acknowledges that the absences were unexcused. Since ECCF policy provides that "an employee who has three occasions of absence ... within a three month period will receive an oral reprimand," Ms. Walborn's contention that the reprimand was retaliatory is likewise baseless. The record simply provides no evidence of retaliation.

Fourth, Ms. Walborn contends that the erroneous notice of termination constitutes evidence of retaliation. As noted above, her extended absence in December 1994 was excused, but the doctor's note had been misplaced. When Ms. Walborn pointed out the error, VandeVelde rescinded the notice of termination and issued Ms. Walborn a letter of apology. In addition, the administrative assistant responsible for the error received a

written reprimand. Again, there is no evidence in the record substantiating Ms. Walborn's belief that the notice of termination was retaliatory.

Fifth, Ms. Walborn complains that Vande-Velde's insistence that she provide medical documentation of her condition following her March 5, 1994 request for accommodation before she could return to work cannot form the basis of her retaliation claim. To the extent that Ms. Walborn makes arguments that relate back to her disability and the failure to reasonably accommodate, this issue was litigated in the first lawsuit she brought against ECCF and thus is res judicata. Moreover, Ms. Walborn proffers no evidence that this documentation requirement was retaliatory.

Sixth, Ms. Walborn contends that her poor holiday schedule in 1994 was retaliatory. However, this schedule may not form the basis of her retaliation claim since she was on extended sick leave throughout this period and thus suffered no adverse employment action.

Finally, Ms. Walborn contends she was unjustifiably disciplined in connection with improperly documenting a resident's fall. However, Ms. Walborn suffered no adverse employment action since ECCF canceled the pre-disciplinary hearing it had scheduled to discuss the matter after it learned that she had made a "late entry." The record is devoid of evidence suggesting that this incident was retaliatory.

We agree with the District Court that no reasonable juror could conclude that a causal connection exists between any of the incidents Ms. Walborn alleges and the protected activity. The fact that Ms. Walborn complains of so many instances of retaliatory conduct does not change our analysis. Therefore, we hold that the District Court properly granted ECCF's motion for summary judgment.

### III. CONCLUSION

Accordingly, we **AFFIRM** the order of the District Court.