Jan Albert CREUSERE,
Plaintiff–Appellant,

v.

BOARD OF EDUCATION OF the CITY
SCHOOL DISTRICT OF the CITY OF
CINCINNATI, Defendant–Appellee.

No. 02–3426.

United States Court of Appeals,
Sixth Circuit.

Dec. 18, 2003.

Jan Albert Creusere, pro se, Cincinnati, OH, for Plaintiff–Appellant.

David T. Croall, Porter, Wright, Morris & Arthur, Cincinnati, OH, for Defendant–Appellee.

Before: MOORE and ROGERS, Circuit Judges; FORESTER, District Judge.*

ROGERS, Circuit Judge.

Jan Creusere, a Sabbatarian, was employed periodically as a temporary carpenter for the Cincinnati Board of Education (the "Board") from June 1994 to August 1996. In September 1996, Creusere's supervisor gave him an evaluation, in which his supervisor recommended that Creusere not be rehired in the future. Creusere filed suit after he learned he would not be rehired by the Board, claiming that the Board: (1) failed to make reasonable accommodation of his religious needs as required by Title VII, because he was not allowed to work overtime on Sundays instead of Saturdays; (2) retaliated against him because of his religious beliefs in violation of Title VII; (3) violated his right to free exercise of religion under the First Amendment; and (4) violated Ohio public policy because he was wrongfully discharged. The district court granted the Board summary judgment on all of the claims, except for the retaliation claim. Following a bench trial before a United States Magistrate Judge, the magistrate entered judgment for the Board against Creusere on the retaliation claim as well. Creusere's suit was also brought against Creusere's supervisors, Russell Bravard and Thomas Campbell, for individual liability under Title VII. The district court granted summary judgment on the Title VII individual liability claims, finding that the supervisors were entitled to qualified immunity. Because Creusere has failed to demonstrate claims under Title VII, the First Amendment, or Ohio public policy, we affirm the judgments of the district and the magistrate courts.

* The Honorable Karl S. Forester, United States Chief District Judge for the Eastern District of Kentucky, sitting by designation.

## Facts

Creusere is a Sabbatarian and a member of the Worldwide Church of God. In accordance with his faith, Creusere keeps the Sabbath from sunset Fridays to sunset Saturdays and other holy days, such as Passover and the Feast of Trumpets.

Creusere graduated from high school and college, and works as a carpenter in the Cincinnati area, where he is a member of the Southwest Ohio District Council of Carpenters (the "Union"). Between June 13, 1994 and August 30, 1996, Creusere worked periodically for the Cincinnati Board of Education under the terms of the Collective Bargaining Agreement ("CBA") that was in effect between the Board and the Union.[1] During these periodic periods of employment, four issues arose that later prompted Creusere to bring this suit–Sunday overtime, holiday pay, working conditions, and the failure of the Board to recall him back to work.

*Sunday Overtime*

Several times, during the course of Creusere's employment, overtime was made available on Saturdays. Each time Creusere was asked if he would like to work, but due to his religious convictions, he declined. The Board did not punish him in any way, but he was unable to receive overtime pay. Creusere offered to work overtime on Sundays for the same pay rate as those who worked on Saturdays.[2] Creusere's direct supervisor, the carpentry foreman, Russell Bravard, denied this request. The Board claims that this denial was because: (1) it would be a violation of the CBA to pay Creusere less than double-time for work on Sundays; (2) Bravard would need to get special permission for Sunday overtime, and this permission was rarely granted; (3) the Board would need to open an otherwise closed building so that Creusere could work even though it was not urgent; (4) the Board would be forced to pay double-time to a permanent employee because Creusere could not be left alone in the building for security and safety reasons.

Creusere was able to work on Sunday on one occasion in August 1994, when overtime was offered to all employees. For this work, he was paid double-time, but he protested this pay in a letter to the Board's human resources department, seeking time-and-a-half rather than double-time. The Board did not reduce his pay.

Creusere occasionally worked the second shift during his employ with the Board. Second shift usually began at around two o'clock in the afternoon and lasted until ten-thirty at night. This shift would conflict with the Sabbath on Fridays because sunset occurred around seven o'clock in the evening. The Board arranged for someone to replace Creusere Friday evenings.

Creusere also requested that he work on Christmas Day and New Year's Day because he did not celebrate these holidays. The Board claims that his request was denied for the same reasons as his requests to work on Sundays, although Creusere claims he was allowed to work alone on New Year's Day, 1995.

---

1. Under the terms of the CBA there were three categories of employment: (1) full-time, permanent employees; (2) full-time, probationary employees; and (3) temporary or casual employees, which are hired on temporary, seasonal, provisional, or emergency bases.

2. According to the CBA, employees were to receive time-and-a-half for working on Saturdays and double-time for working on Sundays.

*Holiday Pay*

The Board has a policy not to pay temporary employees for holidays, and regular employees are not paid for holidays if they take a personal day before or after the holiday. In 1994, the Feast of Trumpets fell on the Tuesday after Labor Day. Creusere observed this religious holiday and did not work. When he received his paycheck, he noticed that he was not paid for Labor Day, but that all of the other temporary employees were paid for that holiday.

Creusere requested to be paid for the Labor Day holiday because otherwise he would be penalized for his religious observance. Thomas Campbell, from human resources, agreed to pay Creusere for Labor Day. However, Creusere's letter brought to the attention of the Board the fact that temporary employees were being paid for holidays. As this was against pre-existing Board policy, the practice was stopped. Creusere's temporary co-workers were upset because they perceived him as the reason they would no longer be paid for holidays.

*Working Conditions*

During his employment, Creusere became convinced that the equipment the carpenters were required to use, such as ladders and scaffolding, was unsafe and in violation of Occupational Safety and Health Administration ("OSHA") regulations. Creusere's concern was further reinforced by an accident that occurred on March 30, 1995, when a ladder Creusere was working on collapsed, and he was injured. He was placed on restricted duty and eventually on temporary disability because of his injuries.

Creusere continued to complain that much of the Board's equipment was dangerous. In the summer of 1996, he took home a Board-owned wooden ladder that was allegedly broken and held together by duct-tape, because he deemed the ladder unsafe. Creusere did not get permission from anyone and did not tell anyone affiliated with the Board of his actions until over a year later when he told the Board's general counsel in connection with a lawsuit in state court.

In addition, other carpenters apparently smoked on the job occasionally. Creusere did not approve and also believed this presented a safety hazard (fire ignition, inhalation, etc.). He complained to his superiors, and the employees were told to stop because it was against Board policy to smoke in schools.

*Failure to Recall*

After the injuries sustained by Creusere when the ladder collapsed in the spring of 1995, the Board initially complied with the physical restrictions placed on him by a physician, but he was eventually placed on temporary disability leave. Approximately a year later in June 1996, he was called back to work for the Board.

The Board claims that near the end of August, 1996, it decided to lay off some workers because of budget concerns and a lack of work. Accordingly, Creusere was laid off on August 30, 1996. The Board received a letter from Creusere on September 11, 1996, in which he complained that the Board had discriminated against him because of his religion. The district court describes the letter as

identif[ying] ... examples of discrimination [such as] the Board's refusal to allow him to work on Sundays, insistence on paying him double pay on the one occasion when Sunday work was required, failure to pay him for Labor Day in 1994, and refusal to allow him to work on Christmas Day. Creusere also stated that, although the Board remedied its failure to pay him for Labor Day, Campbell retaliated against him when

he cut off holiday pay for all temporary employees.

Supplemental Appendix at 122.

The superintendent referred the letter to the Board's EEO/Affirmative Action Officer, Doris Stokes, for investigation. Stokes discussed the letter with Russell Welty, Bravard's supervisor and the supervisor of all the craftspeople.[3] Stokes wrote a memorandum to the superintendent that summarized her findings. In this memorandum, dated September 26, 1996, Stokes summarized Creusere's complaints and stated that she could not find a valid issue, because the Board made accommodations for Creusere and it followed the provisions of the CBA.

Two days earlier, on Tuesday, September 24, 1996, Bravard had conducted a performance evaluation of Creusere. In this evaluation, Bravard noted that Creusere needed improvement in the categories of knowledge, relationship with people, and attitude. He elaborated that Creusere's knowledge was limited to the installation of ceiling tiles, that "no one wants to work with him," and that Creusere "seems to think people do not like him because of his religion." Performance evaluation, Supplemental Appendix at 186. In this evaluation, Bravard recommended that Creusere should not be rehired. Bravard alleges that he was unaware of Creusere's September 11 letter when he completed his evaluation, because he was out of the country.[4]

Creusere has not been recalled by the Board since that time, and he complains that other carpenters with less seniority have been employed by the Board. In January 1997, he filed a discrimination complaint with the Ohio Civil Rights Commission ("OCRC").

## Procedural History

On February 11, 1998, Creusere filed a complaint against the Board, Campbell, and Bravard in the district court seeking relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging that the Board failed to accommodate his religious beliefs and engaged in retaliation for opposing religious discrimination in violation of Title VII and the First Amendment Free Exercise clause.[5] In July 1999, Creusere amended his complaint to allege a violation of Ohio's public policy by failing to rehire him in retaliation for his complaints against smoking in the workplace.

On September 1, 1999, all parties moved for summary judgment.[6] The district court denied Creusere's motion, but granted the Board's motion on the merits, except with respect to Creusere's retaliation and Ohio public policy claims.[7] In addition, the court held that Campbell and Bravard were not individually liable, as

---

3. Welty is also a member of the same denomination as Creusere, but not the same congregation. Welty was not a strict Sabbatarian and would work on Saturdays without pay.

4. Bravard traveled to Europe from August 30 to September 22.

5. On October 24, 1997, the Union filed a complaint in state court claiming that the Board's decision not to rehire Creusere violated the anti-discrimination and rehiring provisions of the CBA. On January 31, 2001, the state court declined to proceed with the Un-

ion's claim for discrimination under the CBA after the federal court granted summary judgment as to the religious discrimination issue. The state court indicated that it would proceed with any remaining issues when the federal litigation ends.

6. Creusere moved for partial summary judgment only as to liability.

7. The Board mistakenly did not argue for summary judgment on the Ohio public policy claim.

818

Creusere did not make a threshold showing that his statutory or constitutional rights were violated. The Union subsequently sought to intervene, but the district court denied its motion because it was untimely. On July 6, 2001, the parties consented to referral of the remaining claims to a magistrate for final disposition under 28 U.S.C. § 636(c). The Board filed a motion for summary judgment on the Ohio public policy claim, and this motion was granted by the magistrate. On December 10–12, a bench trial was held on Creusere's Title VII retaliation claim. The magistrate ruled for the Board on March 14, 2002. Thereafter, Creusere filed a timely notice of appeal as to the disposition of both his Title VII accommodation and retaliation claims, his free exercise claim, and the Ohio public policy claim. In addition to his claims against the Board, Creusere appeals the dismissal of the Title VII individual liability claims against Bravard and Campbell. Further, he seeks to reverse the denial of the Union's intervention motion.

## Discussion

### I. Title VII Claims

#### A. Reasonable Accommodation

■ The district court properly granted the Board's motion for summary judgment with regard to Creusere's religious accommodation claim, finding that as a matter of law the Board reasonably accommodated him. This court reviews summary judgment motions *de novo*. *Richard v. Ray*, 290 F.3d 810, 812 (6th Cir.2002).

Creusere argues that the Board violated Title VII by not accommodating his religious needs when it refused to allow him to work Sundays and holidays that he did not celebrate. Title VII states:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . or

(2) to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . religion. . . .

42 U.S.C. § 2000e–2(a)(1)–(2). Religion is defined as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

In analyzing a religious accommodation claim, a court must first decide whether the employer's conduct was a reasonable accommodation of the employee's religion. *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986). If the employer did not offer a reasonable accommodation, then the court must determine whether a reasonable accommodation would place an undue burden on the employer. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). An employer is liable under Title VII only if the accommodation of the employee's beliefs would not present an undue burden. *Id.*

Creusere concedes that the Board accommodated his request to be off on the Sabbath by not requiring him to work on Saturdays or on Fridays after sundown. Creusere principally alleges that the Board failed to make reasonable accommodations by refusing to allow him to work overtime on Sundays instead of on Saturdays. Creusere argues that the Board

was required to show that it would be unduly burdensome either to permit him to work on Sundays or to find an alternative arrangement. Further, he states that the Board had to address the potential undue burden each and every time he requested to work on Sundays in lieu of Saturdays, and, because this was not done, the Board is liable.

The Board contends that it reasonably accommodated Creusere's religious beliefs because he was granted the time off he requested and was never disciplined or adversely affected. The district court agreed with this assessment. However, the Board also recognizes that it did not do all that Creusere would have liked, as it did not allow him to work on Sundays and various holidays. The Board argues, however, that to accommodate Creusere in this way would amount to an undue burden.

In religious accommodation cases, an undue burden or undue hardship is defined as more than a *de minimis* cost to the employer. *Trans World Airlines*, 432 U.S. at 84; *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir.1994). In cases in which seniority-based systems allegedly prevent religious accommodation, courts have held that the employer is not re-

quired to violate a collective bargaining agreement to accommodate the employee. *Trans World Airlines*, 432 U.S. at 79; *Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 518–19 (6th Cir.2002).[8]

If Creusere was allowed to work on Sunday, the CBA would dictate that he be paid double-time. To do otherwise would violate the CBA. In some situations, the payment of a premium overtime wage could be considered an undue hardship. *See Trans World Airlines*, 432 U.S. at 68–70. Additionally, even if Creusere was only paid time-and-a-half for Sunday work, the Board would have to pay at least one other employee double-time to open the building. These costs are clearly more than *de minimis* and are therefore sufficient to defeat a Title VII religious accommodation claim.[9]

An employer only needs to make reasonable accommodations for an employee's religion. This principle does not require the employer to accommodate the employee in the way the employee finds to be the most desirable. *Ansonia*, 479 U.S. at 68. Creusere may be unhappy because he could not work as much overtime as other employees, but that is insufficient to make out a reasonable accommodation claim.[10]

---

**8.** The seniority system applicable in *Trans World Airlines* and *Virts* is important because of 42 U.S.C. § 2000e–2(h), which states in part:

Notwithstanding any other provision of this subchapter, it shall *not* be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide *seniority* or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of . . . religion. . . .
(emphasis added).

**9.** Creusere argues that allowing him to work Sundays instead of Saturdays at the time-and-

a-half rate would only cost the Board $560 a year. This does not include the pay the Board would have to pay the one or two other employees who would also be required to work if Creusere were allowed to work on Sundays. Further, there is no evidence in the record to show how that figure was computed.

**10.** Creusere was not guaranteed or promised any overtime. Further, the Supreme Court has noted that allowing an employee to take unpaid leave is a reasonable accommodation. *Ansonia*, 479 U.S. at 70–71 ("The provision of unpaid leave eliminates the conflict between employment requirements and religious practices by allowing the individual to observe fully religious holy days and requires him only to give up compensation for a day that he did not in fact work.").

**820**

Therefore, the district court's summary judgment was proper.

### B. Retaliation

■ The magistrate's factual decisions regarding the retaliation claim were not clearly erroneous and his conclusions of law were sound. We therefore affirm the magistrate court's judgment. Creusere alleges that the Board retaliated against him by not rehiring him because of his religious beliefs.[11] The retaliation claim was tried before a magistrate in a three-day bench trial, after which the magistrate ruled for the Board. The magistrate found that Creusere had not demonstrated a causal nexus between his religious accommodation and the decision not to rehire him.

We review judgments rendered by a magistrate pursuant to 28 U.S.C. § 636(c) as we would those that have been rendered by a district judge. *Crocker v. Runyon,* 207 F.3d 314, 318 (6th Cir.2000). The factual findings of a district court will only be set aside if they are clearly erroneous. FED. R. CIV. P. 52(a). The conclusions of law are reviewed *de novo. Overton Distributors, Inc. v. Heritage Bank,* 340 F.3d 361, 366 (6th Cir.2003).

Title VII prohibits employers from retaliating against employees for their opposition to an action made unlawful by Title VII or their participation in an investigation of an unlawful action. 42 U.S.C. § 2000e–3(a); *see Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 578 (6th Cir.2000).

The Supreme Court has created a three-part burden-shifting test to prove discrimination based upon circumstantial evidence under Title VII:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden [of production] shifts to the defendants "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Cmty Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

To succeed in a Title VII retaliation claim, a plaintiff must prove by a preponderance of the evidence in his *prima facie* case that

(1) [he] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor: and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 793 (6th Cir.2000) (emphasis omitted); *see also E.E.O.C. v. Avery Dennison Corp.,* 104 F.3d 858, 860–62 (6th Cir.1997). With regard to the fourth element, "[t]he evidence must be sufficient to raise an inference that the protected activi-

---

11. On appeal, Creusere argues that the Board retaliated against him by forcing him to work alone and by requiring him to use his own vehicle and tools. However, Creusere did not raise this argument before the district court, and we will not consider these alleged acts of retaliation for the first time on appeal. *See Foster v. Barilow,* 6 F.3d 405, 407 (6th Cir. 1993).

ty was the likely reason for the adverse action." *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 463 (6th Cir.2001); *see also Walborn v. Erie County Care Facility*, 150 F.3d 584, 589 (6th Cir.1998).

Creusere was clearly engaged in a protected activity by requesting religious accommodation, writing the 1994 letter regarding the Labor Day holiday, and writing the September 11, 1996, letter regarding his layoff. His subsequent OCRC complaint is also protected by Title VII. The additional complaints raised in Creusere's brief such as his complaints about smoking, safety issues, and the CBA, however, are not protected activities under Title VII.

In addition, the Board clearly knew of Creusere's religion and his need for accommodation, and Creusere also was not rehired after he was let go in August 1996. Thus, the second and third elements are satisfied.

The only issue under the four-part test is whether there was a causal nexus between Creusere's protected activity and his adverse employment action. After a bench trial, the magistrate concluded that he had not shown sufficient causal nexus because

> The evidence demonstrates that plaintiff was laid off on August 30, 1996 for one reason and one reason only: because the carpentry workload at the School Board decreased, and there was thus no longer a need for as many temporary/casual carpenters. The evidence also demonstrates that plaintiff was not rehired after his layoff because, as Bravard reasonably determined in his September 24, 1996 evaluation, plaintiff did not get along well with the other School Board carpenters.

Supplemental Appendix at 209. In support, the magistrate noted the almost two year period of time between Creusere's first letter in September 1994 complaining of holiday pay and his layoff in August 1996. *See Jackson v. Pepsi–Cola*, 783 F.2d 50, 54 (6th Cir.1986) ("[T]he time span of over one year from the time [the plaintiff] filed suit, to the time of his firing, militates against a finding of retaliatory discharge. . . ."). In addition, the magistrate determined that Bravard was unaware of Creusere's September 11, 1996, letter when he made his evaluation of Creusere. Further, the magistrate found that Creusere did not file his OCRC complaint until approximately five months after his layoff and four months after Bravard's evaluation recommending the Board not rehire Creusere, and therefore that complaint did not factor into the Board's decision not to rehire him. Finally, the Board knew of Creusere's religious beliefs when he was hired in 1994 and rehired in June 1996. *See Walborn*, 150 F.3d at 589 (engagement in a protected activity after the adverse employment action is insufficient to support a retaliation claim). For these reasons the magistrate concluded that Creusere had not satisfied his *prima facie* case.

Similarly, while Bravard eventually recommended that Creusere not be rehired, he had twice recommended that Creusere be hired with full knowledge of the accommodations Creusere required. Because Bravard both recommended his hire and the decision not to rehire Creusere, it is unlikely that his religion was the motivating factor in the latter decision. *See Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir.1995) ("An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class. This general principle applies regardless of whether the class is age, race, sex, or some other protected classification."). Therefore, the magistrate's factual determination that there was no causal connection was not clearly

erroneous. Creusere's retaliation claim accordingly fails, and we need not reach the magistrate's alternate ground that the defendants proved a legitimate nondiscriminatory reason for the adverse employment action.[12]

## II. First Amendment: Free Exercise of Religion Claim

■ The district court properly granted summary judgment for the Board on Creusere's Free Exercise claim. The district court correctly found that Creusere had not shown that the Board substantially burdened his exercise of religion or retaliated against him because of his religious activity. This court reviews summary judgments *de novo. Richard,* 290 F.3d at 812.

Creusere argues that the Board interfered with his First Amendment right to free exercise of his religion by retaliating against him based on his religious conduct. Prior to the Supreme Court's landmark decision in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court held in unemployment compensation cases such as *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Thomas v. Review Board,* 450 U.S. 707, 717–18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1980), that governmental actions that "substantially burden" a religious practice must be justified by a compelling state interest. The majority in *Smith* questioned the validity of these cases "beyond the unemployment compensation field." *Smith,* 494 U.S. at 883–84. Even assuming that these holdings survive *Smith,* Creusere has failed to present any evidence that the Board substantially burdened his free exercise of religion. To the contrary, Creusere's accommodation requests not to work on the Sabbath and Holy Days were met. He argues that the Board retaliated against him for the September 1994 and September 11, 1996 letters he sent, and that this impeded his free exercise of religion. The district court states that these letters do not constitute religious activity and thus cannot sustain a free exercise claim.[13] Creusere argues that these letters were part of his religious observance because God has called him to press for the Sabbath.[14] Pl. Br. at 29–30. However, Creusere has not shown that the Board hindered his ability to express his religion freely; thus the district court was correct in granting summary judgment.

## III. Ohio Public Policy Claim

■ Creusere argues that he was not rehired, in part, because he complained about employees smoking on the job, which is in violation of Ohio public policy.[15] The magistrate was correct in granting the Board's motion for summary judgment on

---

**12.** Campbell and Bravard are not "employers" as defined by Title VII, and the district court therefore correctly determined that they are not individually liable under Title VII. *See Wathen v. Gen. Elec. Co.,* 115 F.3d 400, 405 (6th Cir.1997).

**13.** It does not appear that Creusere claimed that the letters were part of his religious beliefs at the district court level. The district court noted that this could be part of freedom of expression, but that Creusere did not bring this claim.

**14.** Creusere also points to the Religious Freedom Restoration Act of 1993 (RFRA), 42

U.S.C. § 2000bb *et seq.* Pl. Br. at 30. The Supreme Court has struck down RFRA as unconstitutional. *See City of Boerne v. Flores,* 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). The latest permutation of RFRA, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.,* does not aid plaintiff's case.

**15.** This appears to be a wrongful discharge claim, but as the parties refer to it as an Ohio public policy claim, that is the terminology used in this opinion.

this issue because Creusere was not an at-will employee as required by the Ohio common law.

Ohio recognizes a public policy exception to the employment-at-will doctrine. *Greeley v. Miami Valley Maintenance Contractors, Inc.*, 49 Ohio St.3d 228, 551 N.E.2d 981, 986 (Ohio 1990). An essential element under the Ohio public policy claim is that the employee is employed at-will. *Haynes v. Zoological Soc. of Cincinnati*, 73 Ohio St.3d 254, 652 N.E.2d 948, 951 (Ohio 1995); *see also Edwards v. Dubruiel*, 2002 WL 31846259, at *7 (Ohio Ct.App. Dec.20, 2002) ("The *Greeley* common-law cause of action is available when an 'employee-at-will' has been terminated or subjected to employment discipline in violation of a 'clear public policy.' Courts have emphasized that this cause of action is limited to 'employees-at-will.' "). In *Haynes,* the Ohio Supreme Court held that the employee was not an employee at-will because her employment was governed by the terms of a collective bargaining agreement. *Haynes,* 652 N.E.2d at 950. Likewise, in this case the decisions regarding termination and reemployment were governed by the CBA.[16] Creusere, therefore, cannot bring a claim for termination in contravention of Ohio public policy, and summary judgment was properly granted by the magistrate court.

Even if Creusere were an at-will employee, there is not a clear public policy that has been violated by the Board. *Painter v. Graley,* 70 Ohio St.3d 377, 639 N.E.2d 51, 56 (Ohio 1994) ("[T]o state a claim of wrongful discharge in violation of public policy, a plaintiff must allege facts demonstrating that the employers act of discharging him contravened a 'clear public policy.' "). Clear public policy can be expressed by statutes, constitutions, ad-

ministrative rules and regulations, and the common law. *Kulch v. Structural Fibers, Inc.,* 78 Ohio St.3d 134, 677 N.E.2d 308, 320–21 (Ohio 1997).

Creusere cites the Board's policy against smoking, the Ohio State Fire Code, the City of Cincinnati's municipal code, and OSHA regulations as providing evidence of Ohio's public policy. First, Creusere did not introduce the Ohio State Fire Code provisions to the district court. Arguments not presented to the district court are not properly considered on appeal. *Taft Broad. Co. v. United States,* 929 F.2d 240, 243 (6th Cir.1991) ("issues not litigated in the trial court are generally not appropriate for appellate consideration."). Therefore, we do not address the Ohio State Fire Codes. Second, the Board's policy and Cincinnati's municipal codes are insufficient because they do not show a statewide public policy, as required by Ohio law. *See Greenwood v. Taft, Stettinius & Hollister,* 105 Ohio App.3d 295, 663 N.E.2d 1030, 1034 (Ohio Ct.App.1995) ("public policy sufficient to support an exception to the employment-at-will doctrine must be of uniform statewide application"). Third, while OSHA clearly prohibits smoking in certain instances, *see, e.g.,* 29 C.F.R. § 1910.106(f)(6) (prohibiting smoking around Class I liquids); 29 C.F.R. § 1910.1027(e)(5) (prohibiting smoking in areas above the permissible exposure limit of cadmium); 29 C.F.R. § 1926.62(i)(4)(iii) (same as above only with lead), neither the Occupational Safety and Health Act nor OSHA's specific regulations prohibits smoking in the workplace. Therefore, even if Creusere was an at-will employee, Ohio public policy does not provide a basis

---

16. Creusere alleges that the Board does not follow other aspects of the CBA, and therefore it should not be allowed to use the CBA to claim he is not an at-will employee. These other potential breaches of the CBA are not at issue in this case.

for Creusere to challenge his not being rehired.

## IV. Qualified Immunity

The district court also properly determined Bravard and Campbell were entitled to qualified immunity, because Creusere failed to allege sufficiently that the Board violated a constitutional or statutory right. This court reviews qualified immunity decisions *de novo*. *Risbridger v. Connelly*, 275 F.3d 565, 568 (6th Cir.2002).

The first step to determine if qualified immunity applies is to see if a constitutionally or statutorily protected right has been violated. *See Mattox v. City of Forest Park*, 183 F.3d 515, 520 (6th Cir.1999). Since Creusere has failed to present a viable Free Exercise or Title VII claim, as explained above, Campbell and Bravard are entitled to qualified immunity.

Even if Creusere has presented a valid statutory or constitutional claim, he has not presented evidence that the Bravard and Campbell's actions were not " 'objectively unreasonable in light of the clearly established constitutional right.' " *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir.1998) (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.1994)). To be clearly established "the contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Wilson v. Layne*, 526 U.S. 603, 614–15, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). No evidence has been presented to suggest that the accommodation of Creusere by Campbell and Bravard was so insufficient or so impeded Creusere's religion as to be objectively unreasonable. Therefore, even if a violation of a constitutional right were found, Campbell and Bravard would still be entitled to qualified immunity.

## V. Motion to Intervene

After the state court's decision to stay the state court proceedings until the conclusion of the federal litigation, the Union filed a motion to intervene in the federal proceedings on February 15, 2001. The district court denied the motion to intervene, and Creusere challenges the denial on appeal. It is unclear that Creusere has standing to appeal the district court's denial of the Union's motion to intervene. The Appellees do not argue this point. Even assuming that Creusere has standing to raise this issue, the district court correctly denied the motion as untimely.

There are two types of intervention allowed by the Federal Rules of Civil Procedure–intervention of right and permissive intervention. FED. R. CIV. P. 24(a) & (b). A party seeking either type of intervention must demonstrate "timeliness of the application to intervene." *Jordan v. Michigan Conference of Teamsters Welfare Fund*, 207 F.3d 854, 862 (6th Cir.2000); *Stupak–Thrall v. Glickman*, 226 F.3d 467, 472 (6th Cir.2000); FED. R. CIV. P. 24(a) & (b). The standard of review for the timeliness element is abuse of discretion. *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir.1989).

The determination as to whether a motion to intervene is timely should be evaluated according to the circumstances and is left to the sound discretion of the trial court. *Stupak–Thrall*, 226 F.3d at 472–73; *Bradley v. Milliken*, 828 F.2d 1186, 1191 (6th Cir.1987). The following factors should be considered in determining whether a motion to intervene is timely: (1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure

to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Stupak–Thrall,* 226 F.3d at 473.

The district court held that the Union's motion was untimely because the case was over three years old, discovery was long over, the deadline for dispositive motions had passed months before, and the trial was scheduled in about a month. Creusere alleges that there was more than a month between the scheduled trial and the motion for intervention, and that the trial was delayed anyway because of changes of counsel on both sides of the litigation. The district court concluded that the Union should have known of its interest from the beginning of the litigation, and although its interest is heightened because of the state court's ruling, its interest was not new. Therefore, the Union could have intervened as soon as this case was filed, but as it did not, its motion was too late. As the Union was most likely aware of the litigation for years, but did not seek to intervene until the late date, the district court did not abuse its discretion in deciding the motion was untimely.

The judgments of the district and magistrate courts are AFFIRMED.

