David COULSON, Plaintiff–Appellant,

v.

THE GOODYEAR TIRE & RUBBER COMPANY, Defendant–Appellee.

No. 00–3818.

United States Court of Appeals, Sixth Circuit.

March 14, 2002.

Before BOGGS, GILMAN, and BRIGHT,* Circuit Judges.

PER CURIAM.

David Coulson appeals the grant of summary judgment to Goodyear Tire & Rubber Co. (Goodyear), dismissing his claims of discrimination, failure to accommodate, harassment and retaliation under the Americans with Disabilities Act. 42 U.S.C. § 12112(a) *et seq.* We affirm.

I

Coulson worked as a processing technician for Goodyear in Department 415B of the Research Department. In December 1992, Goodyear transferred Coulson to Department 415C, where he continued working in the same capacity. Following the transfer, Coulson had personality conflicts with a number of people in the department. Coulson alleges that these people teased and harassed him. In July 1993, Coulson sought medical help in coping with problems at work. In September 1993, Coulson requested a transfer to a new department; according to Coulson, this request angered his supervisor, Neal Fair-

---

* The Honorable Myron H. Bright, United States Circuit Judge for the Eighth Circuit, sitting by designation.

cloth, who allegedly informed Coulson through an intermediary not to request a transfer again.

In February 1994 and on several later dates, Coulson discussed suicide with co-workers. Faircloth met with Coulson, and then conferred with resource manager George Sacco, to determine what should be done. Sacco suggested that Coulson get professional help and instructed another employee to facilitate such help.

Coulson met with Goodyear's medical director, Donald Sherman. At the meeting, Coulson claimed he was harassed at work, and that he had had thoughts of suicide, but had no current intention of taking his life.

Sherman concluded that Coulson was not a danger to himself or others. Sherman reported to Wayne Peavy (of Human Resources) that no restrictions were necessary for Coulson's return to work.

Sherman met with Coulson again, and confirmed that he was no longer having suicidal thoughts. However, a few days later, Coulson allegedly discussed suicide with Colleen Lansinger, a supervisor. The day after that discussion, Faircloth e-mailed Sacco, discussing incidents of inappropriate behavior by Coulson. Sherman, Faircloth, and several others determined that a psychiatric evaluation would be appropriate for Coulson. Coulson admitted himself to St. Thomas Hospital. His leave of absence was fully paid by Goodyear.

After five days, Coulson was released from St. Thomas. Dr. Deckert, who supervised Coulson's treatment there, diagnosed Coulson as having "major depression with psychotic features" and "paranoid, obsessive, avoidance traits."

Coulson was returned to work without restrictions. In August 1994, Coulson requested a transfer to another department. This transfer was denied. Later that month, Coulson was escorted by security off of the premises because of a threat Coulson allegedly made against another employee, Mari Assante. Assante gave an affidavit, however, that does not support that charge. Assante did confirm that she heard Coulson speak of suicide in "late August or early September 1994."

Goodyear also alleged that Coulson had had multiple conversations about firearms and bombs with other employees; Goodyear asserts that Coulson made "shooting gestures" with his hands towards other employees. Coulson concedes that he had conversations about weapons at work, but characterizes those conversations as jokes. Goodyear asserts that Mari Assante reported that Coulson threatened to use a machine gun in the lab.

Goodyear then determined that Coulson should be placed on a second leave of absence for the purpose of evaluating whether he would pose a threat to himself or other workers. On September 19, 1994, Coulson was escorted off of Goodyear's property, and was placed on paid leave, contingent on his receiving a medical evaluation.

Dr. Robert Rodriguez, selected by Coulson to make the evaluation, cleared Coulson to return to work on December 7, 1994. Dr. Rodriguez suggested that Coulson should be transferred to another department under different supervisors. Sherman questioned the validity of Rodriguez's diagnosis. Sherman asked that Coulson see Dr. George E. Tesar, a psychiatrist. Tesar diagnosed Coulson with "major depression with psychotic features: in remission versus bi-polar II; in remission" and probable paranoid personality disorder. On March 14, 1995, Tesar cleared Coulson for return to work. Tesar provided an extensive report, which concluded that Coulson was not a danger to himself or others, but that he should be

transferred if possible, or, if transfer were not possible, that he must "demonstrate his resolve to work with the individuals who he has previously perceived as 'harassing.'"

On March 31, 1995, Coulson was instructed to report to work in Department 415C on his normal work shift on Monday, April 3, 1995. Coulson did not report to work, claiming that he should be transferred to another department. On April 4, 1995, Goodyear informed Coulson that "there are no current job openings suitable for [his] qualifications." Goodyear's April 4 letter advised Coulson that he needed to "advise [Goodyear] regarding [Coulson's] intentions to return to work at Goodyear." When Coulson still did not report to work for another 2 weeks, George Sacco terminated Coulson's employment on April 14.

The case was tried before a magistrate judge by the consent of the parties. The magistrate judge granted Goodyear's motion for summary judgment. Coulson timely appealed.

## II

### A. Discrimination

Summary judgment is appropriate where there is no material issue of disputed fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may simply point out that the opposing side has offered no, or insufficient, proof on an issue. *Ibid.* Review of a grant of summary judgment is *de novo*.

The Americans with Disabilities Act (ADA) prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to application procedures, the hiring, advancement, or discharge of employees, employment compensation, job training and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a).

To recover on a claim of discrimination under the Act, the plaintiff must show (1) that he is a member of a protected class (disabled in fact or regarded as disabled), (2) that he is otherwise qualified to perform the job requirements with or without reasonable accommodation, and (3) that he was discharged "solely by reason of his handicap." *Monette v. Electronic Data Systems*, 90 F.3d 1173, 1178 (6th Cir. 1996).[1]

The parties dispute at great length whether Coulson is disabled, or was regarded by Goodyear as disabled (Coulson himself has never admitted to being disabled), but the magistrate judge did not reach this question. Therefore, an assessment of part (1) of the *Monette* formulation, above, is improper on appeal. Part (2) is not disputed, since both sides agree that Coulson was capable of doing his job. Instead, this case turns on whether, under part (3), Coulson was discharged solely by reason of his alleged disability, or whether he was discharged for failing to report to

---

1. The Sixth Circuit in *Swanson v. Univ. of Cincinnati*, 268 F.3d 307 (6th Cir.2001), held that a plaintiff made a *prima facie* showing by providing evidence that (1) he was disabled under the statute, (2) he was "otherwise qualified" to perform the work, with or without reasonable accommodation, (3) he had suffered an adverse employment action, (4) the employer had reason to know of the disability and (5) the position remained open after the adverse employment decision or that the disabled individual was replaced. *Id.* at 314. However, this holding is not in conflict with the magistrate judge's determination, which assumed that Coulson had made out a *prima facie* case, but had failed to establish that Goodyear's reason for firing him was pretextual.

work for ten days, as claimed by Goodyear.

In order to defeat a motion for summary judgment in a retaliation or discrimination case, a plaintiff must support a claim of discrimination by either indirect or direct means. The direct evidence standard essentially requires an admission in some form by the employer that it relied on the disability in making an employment decision. *Monette*, 90 F.3d at 1173. Likewise, an admission by the employer that it discharged an employee for the inability to perform a job function, when that inability is caused by a disability, is direct evidence of discharge based on the disability.[2] *Hamlin v. Charter Twp. of Flint*, 165 F.3d 426, 429–30 (6th Cir.1999). The direct evidence standard also applies when there is other direct evidence that the employer relied on the plaintiff's disability in making the discharge decision. *Ibid.*

An employment action is considered "adverse" under the ADA if it represents "a materially adverse change in the terms of ... employment." *Kocsis v. Multi–Care Management Inc.*, 97 F.3d 876, 885 (6th Cir.1996). Goodyear's requirement that Coulson take medical leaves did not constitute an adverse employment action. The ADA permits an employer to require a medical examination to determine qualifications for the job and for the health and safety of employees. *Sullivan v. River Valley School District*, 197 F.3d 804, 813 (6th Cir.1999). Therefore, we only address the rationale articulated by Goodyear for discharging Coulson.

Goodyear asserts that it fired Coulson because Coulson refused to return to work. There is no direct evidence that Goodyear fired Coulson because of his disability. The *Hamlin* "inability to perform" rule does not apply, since both sides agreed that Coulson could in fact do his job (as he had for 12 years).

The indirect standard therefore applies. Under the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), adopted in disability discrimination cases for indirect evidence situations, *see, e.g., Monette*, 90 F.3d at 1173, once the employer articulates a nondiscriminatory or nonretaliatory reason for the employment action, the plaintiff then must, in turn, establish that the employer's articulated reason is pretextual. *Monette*, 90 F.3d at 1186. This is what Coulson has not done.

In seeking to avoid this burden, Coulson places great reliance on *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), arguing that this case has changed the law with respect to the appropriateness of summary judgment claims under the burden-shifting scheme set forth above. Specifically, the *Reeves* Court found that:

---

2. When direct evidence of discharge based on disability is available, we do not employ a burden-shifting approach. *Monette*, 90 F.3d at 1182. Of course, the plaintiff must be qualified, with or without reasonable accommodation, to perform the essential functions of the job in question. When an employer states that an employee is incapable of performing a job because of a disability, plaintiffs generally reply in three ways. First, they may argue that the job function is not essential. Second, they may argue that they can perform the function with reasonable accommodation. Third, they may argue that the employer has a duty to consider transferring them to another position that they could perform. *See, e.g., Hamlin v. Charter Twp. of Flint*, 165 F.3d 426, 429–30 (6th Cir.1999). In any case, since Goodyear did not state that it fired Coulson for inability to perform a job function, the *Hamlin* analysis does not apply, and the indirect evidence (burden-shifting) approach is required.

[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Id.* at 148. This is no sea-change. The *Reeves* court merely points out that, in some cases, the Plaintiff can avoid summary judgment by establishing that the stated reason for an adverse employment action was pretextual; the plaintiff need not always separately raise a genuine issue of material fact as to discriminatory intent at the summary judgment phase. *Ibid.* While it is true that "pretext-plus" is not the law, we reject Coulson's intimation that *Reeves* stands for the proposition that a prima facie case is sufficient, alone, to complete plaintiff's production burdens under the indirect evidence burden-shifting scheme. Evidence of pretext is still required.

The *Reeves* court also maintained the prevailing view that it will not suffice for a non-moving party to raise just a shadow of a doubt or "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must rather "present affirmative evidence" on the issue in order to prevail. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). In fact, the *Reeves* court noted that even where a plaintiff has "set forth sufficient evidence to reject the defendant's explanation," there are instances where the offer of proof is so weak that "no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097.

■ Coulson has failed to establish the pretextuality of Goodyear's explanation for his discharge. Coulson points to an e-mail written in September 1994 (seven months before his termination) by Neil Faircloth; the relevant portion of the e-mail reads:

George, per discussion, Dave [Coulson] is a problem and a liability to the lab and Goodyear. I consider his statements about guns and sexual anatomy harassment to other lab associates. I want to discharge [Coulson]; if that is unacceptable, I am going to standard progressive disciplinary steps beginning with confrontation, stop it with consequences, and a written document. *It doesn't matter what mental state he is in, his behavior is unacceptable, and we have been incredibly benevolent.*

Coulson argues that the above demonstrates a plan to "set up" and terminate him. Coulson asserts that this, in addition what he terms the intentional failure of Goodyear to accommodate him by transferring him to another department, establishes that Goodyear's termination based on his refusal to return to work was pretextual.

This argument fails for two reasons. First, the e-mail clearly evinces a desire to fire Coulson. However, that intent, as the magistrate judge pointed out, was to fire him *no matter what* his mental state. As the magistrate judge noted, the e-mail stated that Faircloth wanted to fire Coulson *in spite of* his mental state rather than *because of* it. Further, Faircloth indicated that he was willing to move forward with progressive discipline, *instead* of firing Coulson. Coulson was not fired at that time or in response to Faircloth's e-mail. He was fired seven months later, for failing to return to work.

B. Accommodation

■ Coulson also claims that he has demonstrated that Goodyear's articulated reason for discharging him was pretextual by arguing that Goodyear failed to accommodate him by transferring him to another department.

Claims based on a failure to accommodate are most common when an employer has expressly relied on the employee's disability in the decisionmaking process (*i.e.*, has made a judgment that because of the disability, the person is no longer qualified to fill that position). *Monette*, 90 F.3d 1173, 1182–83. The question in such cases is almost always whether or not the employee could have performed his job function with a reasonable accommodation. *Ibid.* It is not clear that an accommodation analysis should be performed in a case like this one, where the real issue is alleged discrimination based on a perceived, rather than actual, disability. Both sides admit that Coulson could, in fact, perform his job [1]—thus making it unnecessary to show that he could perform his job with the aid of a reasonable accommodation.

Regardless, when a plaintiff employee claims that he would have been capable of performing his job if he had been accommodated, he has the initial burden of having proposed an accommodation and showing that the accommodation is objectively reasonable. *Monette*, 90 F.3d at 1183. Once a reasonable accommodation has been proposed, the employer then has the burden of persuasion on whether that accommodation would impose an undue hardship on the employer. *Ibid.*

Transfer or reassignment of an employee is within the realm of possible reasonable (and therefore required) accommodation. *Burns v. Coca–Cola Enters., Inc.*, 222 F.3d 247 (6th Cir.2000) (holding that an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the company for which that employee is otherwise qualified). Accommodation within the individual's current position is preferred. *Cassidy v. Detroit Edison Co.*, 138 F.3d 629 (6th Cir.1998). When transfer is appropriate, an employer is only required to transfer the employee to a vacant position. *Burns*, 222 F.3d at 257; *Cassidy*, 138 F.3d at 634; *Gile v. United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir. 1996). The *Burns* court examined 7th Circuit precedent in *Dalton v. Subaru–Isuzu Automotive Inc.*, which noted that "the ADA places a duty on the employer to ascertain whether he has some job that the employee might be able to fill." 141 F.3d 667, 677. The *Burns* court accepted that the ADA imposed a "duty to consider" transferring an employee; however, the court limited this duty by noting that employers are not required to "reassign the disabled employee to a position for which he is not otherwise qualified ... in order to accommodate the disabled individual," or to create new jobs to accommodate disabled employees. *Burns*, 222 F.3d at 257. Therefore, a request for transfer as a reasonable accommodation must be to a currently existing position for which the disabled person is qualified. *Ibid.*

Since Coulson failed to offer proof that there were currently available positions for which he was qualified, he cannot prevail. *See Smith v. Ameritech*, 129 F.3d 857, 867 (6th Cir.1997). Goodyear informed Coulson that transfer would not be possible, precisely because positions were not available. Goodyear's April 4 letter to Coulson

---

1. Although, to complicate matters, they do not agree that they agree. Coulson claims that Goodyear perceived him as mentally disabled, and fired him because of its perception that his mental disability disqualified him from performing his job. The problem with this argument is that Goodyear simply does not defend its actions by stating that Coulson was unqualified. Rather, it defends by noting that there was a valid, nondiscriminatory reason for discharging Coulson, which was valid regardless of Coulson's qualifications or actual or perceived disability.

stated that "[a]s there are no current job openings suitable for your qualifications, reassignment to a different department is not an alternative." Without any contravening evidence that such an opening existed, Coulson's request for an accommodation is unreasonable.

■ Second, although transfer can be a reasonable accommodation, under these circumstances it would not be. Coulson is seeking to force Goodyear to transfer him so that he will not be required to work with certain people. As the magistrate judge noted, this would be asking the court to "establish the conditions of his employment, most notably with whom he will work." *Gaul v. Lucent Technologies, Inc.,* 134 F.3d 576, 581 (3d Cir.1998). Courts are not meant to act as a super-bureau of Human Resources. Since Coulson's proposed accommodation was unreasonable, grant of summary judgment was appropriate.

## C. Hostile Work Environment

Coulson also brings a hostile work environment claim, based on alleged workplace harassment. The Sixth Circuit has recognized such claims. *Keever v. Middletown,* 145 F.3d 809 (6th Cir.1998). The standard for ADA hostile work environment claims tracks that used for hostile work environment sexual harassment claims. *See, e.g., McClain v. Southwest Steel Co.,* 940 F.Supp. 295 (N.D.Okla.1996). The hostile work environment standard set forth in *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), states that the workplace must be permeated with "discriminatory intimidation, ridicule and insult" that is "sufficiently severe and pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Harris* points out that "mere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment" to create a hostile work environment. *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (citations omitted).

■ In the instant case, Coulson alleges that he was subject to name-calling and harassment due to his short stature. Coulson also alleges that he was called "looney toon," "wacko," "crazy," and "Rambo." This name-calling, alone, is not sufficient to create a hostile work environment. *See, e.g., McClain,* 940 F.Supp. at 302 (references to plaintiff as "crazy" and "lunatic" and asking "what the f ___'s wrong with you" did "not create an environment so hostile as to constitute an adverse employment action under the ADA").

## D. Retaliation

Coulson also alleges that Goodyear discharged him in retaliation for bringing a lawsuit. The ADA forbids retaliation for any action protected by the ADA. 42 U.S.C. § 12203(a). To succeed on a retaliation claim, a plaintiff must show (1) that he engaged in protected activity, (2) that the defendant was aware of the protected activity, (3) that the plaintiff suffered an adverse employment action and (4) that a causal connection existed between the protected activity and the adverse action. *Walborn v. Erie County Care Facility,* 150 F.3d 584, 588–89 (6th Cir.1998).

A retaliation claim may be established directly, by persuading the court that a discriminatory reason more likely than not caused the adverse employment action, or indirectly, by persuading the court that the employer's asserted reason for an adverse action is pretextual. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Coulson maintains that he was fired because he sued Goodyear. Coulson argues that the fact that he was fired less than three weeks after he filed a lawsuit against Goodyear, combined with the fact that seven months earlier Faircloth had written an e-mail noting that he wished to fire Coulson "no matter what his mental state," establishes the pretextuality of Goodyear's asserted reason for termination (that Coulson did not report for work). None of the arguments offered by Coulson create a permissible inference of causation; *i.e.*, tend to show that after over a year of negotiating and working with Coulson to get him back to work (seven months of which Coulson was on paid leave), and a two-week period during which Coulson was asked to return to work but did not, Goodyear actually fired him on some pretext because he brought suit.

A pure temporal relationship (A occurred after B) is not enough to establish a causal connection. *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986). Since Coulson failed to offer sufficient evidence of a causal relationship between his filing of suit and his termination, or to show that the asserted reason for his termination was pretextual, his claims must fail.

### III

The District Court's judgment is therefore AFFIRMED.