**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0572n.06

Case No. 13-2632

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Jul 29, 2014

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SHEMELIA BURDETT-FOSTER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| BLUE CROSS BLUE SHIELD OF | ) | MICHIGAN |
| MICHIGAN, | ) | |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |

BEFORE: WHITE, DONALD, and O'MALLEY, Circuit Judges.[*]

**Bernice B. Donald, Circuit Judge.** Blue Care Network of Michigan ("BCN"), a wholly owned subsidiary of Blue Cross Blue Shield of Michigan ("BCBS"), terminated Shemelia Burdett-Foster's employment on January 26, 2011. Burdett-Foster filed suit, alleging that BCN impermissibly fired her because of her race and medical disabilities. In a motion for summary judgment, BCBS countered that Burdett-Foster was terminated for cause. The district court agreed and entered judgment in favor of BCBS. We **AFFIRM**.

---

[*] The Honorable Kathleen M. O'Malley, United States Court of Appeals for the Federal Circuit, sitting by designation.

I.

Burdett-Foster, an African-American woman, began working for BCN on July 10, 2000. She worked in a number of different positions. When BCBS and BCN merged around 2011, Ferren Gibson, an African-American male with whom Burdett-Foster had worked, took over managing Burdett-Foster's department. From June 2009 until her termination Burdett-Foster was a provider registration specialist. Burdett-Foster was a bargaining-unit employee subject to the Master Labor Agreement between BCN and her union—the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW").

In early 2011, Burdett-Foster was diagnosed with depression. BCN's third-party disability program administrator, CompOne Administrators, granted Burdett-Foster a short-term disability ("STD") leave of absence from March 8, 2011 to May 22, 2011. When Burdett-Foster returned to work, her doctor requested she be able to use the bathroom frequently because of a side effect of the blood-pressure medication she was taking. BCN agreed to this accommodation on a trial basis. Burdett-Foster testified that although she was allowed frequent bathroom breaks, her direct supervisor, Al Walgenbach, followed her to the bathroom on a daily basis, stood outside the bathroom door with arms folded, and followed her around the building.

In mid-2011, certain BCN employees, including some of Burdett-Foster's more senior coworkers, began performing backup telephone duties when needed to address the high volume of customer calls. When Burdett-Foster returned to work after her STD leave, the UAW complained that Burdett-Foster, as a junior employee, should be required to start telephone training so that she could perform backup duty. Burdett-Foster's supervisors then notified her that she would need to complete telephone training. In July 2011, Burdett-Foster told a BCN

director, Barbara Derian, that she did not want to answer the telephone. In a memo, Derian

summarized:

> While visiting the PEDM operations, I stopped by to say "hi" to Shemilia [sic]. She started to cry and I asked if she would like to go off the floor and speak with me. I asked if she wanted to go somewhere private. She said "yes" and I took her to the QM library.
>
> She told me that she did not want to be on the phones. She was very upset and crying. We discussed if she likes to help people and that phone work was helping people. We also discussed how sometimes we don't have passion for everything we do at work but that if we can put on a service persona for when we are at work, we can be successful. I explained that we need to follow the contract and her seniority requires that she be a phone back up. It is a back up position not full time phones. I was able to calm her down and she returned to the floor.

Burdett-Foster completed the basic part of phone training; that is, she learned to operate

the phones and sat with two persons to listen to calls. Shortly thereafter, in either July or August

of 2011, Burdett-Foster informed her managers that she could not complete telephone training

because she had a problem with her vocal cords that prevented her from speaking above a

whisper. BCN immediately postponed her training. A few weeks later, at BCN's request,

Burdett-Foster submitted documentation from her treating physician, Michael Stone, M.D. In an

August 15, 2011 letter, Dr. Stone explained:

> [Ms. Burdett Foster] comes in with a several week history of hoarseness. She noticed this after going to a concert and screaming a lot. She has also had persistent sore throat . . . .
>
> She is speaking with a whisper.
> . . . .
> Assessment & Plan: Vocal cord dysfunction. Her exam is entirely normal. She just needs to speak the right way. She likely developed some pain at [a] concert that resulted in pain with talking. She is able to move her vocal cords normally now but she just cannot sound clear when she does it. I have recommended speech therapy as they will give her some exercises to strengthen her voice and help get rid of the whisper.

Her telephone training was postposed further, and Burdett-Foster was not required to perform backup telephone duties at that time.

Because telephone backup constituted "5-15% of her daily job function" and BCN needed additional telephone assistance, CompOne notified Burdett-Foster that she would have a fit-for-duty evaluation on August 26, 2011 at 10:15 a.m. with Mark Uzansky, D.O., to assess her ability to complete telephone training. Burdett-Foster initially agreed to this evaluation, but at 11:48 p.m. on August 25, she notified BCN's human resources manager, Patricia Brewer, that she would not attend because she had preapproved Personal Time Off ("PTO") on August 26, 2011. CompOne rescheduled the exam with Dr. Uzansky to September 9, 2011, but Burdett-Foster failed to attend this examination. When the exam was again rescheduled to September 16, Dr. Uzansky was unavailable, so Burdett-Foster met with Ted Schwartzenfeld, M.D. Burdett-Foster attended this evaluation, and Dr. Schwartzenfeld diagnosed her with "[h]oarseness–dysphonia" and recommended further evaluation via videostroboscopy—a common procedure that involves using a camera and strobe light to capture vocal cords in motion. Dr. Schwartzenfeld added that until her voice is normal, she should not be talking on the phones.

On October 11, 2011, Mary Kay Mitchell, R.N., of CompOne, notified Burdett-Foster that she needed to schedule a videostroboscopy with Dr. Stone. Burdett-Foster scheduled a videostroboscopy appointment for October 21, 2011 but later cancelled it without notifying BCN or CompOne. She rescheduled the appointment for October 25 but again cancelled without notice. Burdett-Foster wrote Mitchell at CompOne on October 27, 2011, copying Brewer and Craft-Brown:

> The appointment on 10-25-11 was cancelled by me for the same reason as the first appointment. I'm still awaiting Hr [sic] or the union to give me a code in writing so that I can give it to leadership. As stated before I can't leave work without letting leadership know that I'm leaving work and what code I would be using

> while I'm gone. So I need a code for all of the appointments as they are all during work hours.
>
> Ms. Brewer I've sent prior request [sic] about the codes before both schedule [sic] appoints [sic], please advise as to what code I would be using in regards to all of the doctor appointments you're requesting me to go to . . . .

Burdett-Foster, however, had not obtained such a code before attending her earlier medical appointments. Brewer maintained that she had told Burdett-Foster that she did not need a code, and Burdett-Foster acknowledged that UAW Chairperson Valerie Craft-Brown had told her to use a miscellaneous code.

On October 27, 2011, CompOne scheduled a videostroboscopy appointment for Burdett-Foster on November 1, 2011. The next day, Brewer issued Burdett-Foster a five-day disciplinary suspension for insubordination. The disciplinary report states:

> Over the past couple of months, Shemelia Foster has failed [to] keep appointments that [have] been scheduled for her through CompOne. Ms. Foster has been very deliberate in being insubordinate by rescheduling, canceling and/or no showing for appointments that have been scheduled through HR and CompOne.
>
> The following are examples of insubordination: failing to pick up the memo from HR outlining her physician 8/26 appointment, Notifying HR in an untimely manner that she had a day off on the day of the 8/26 appointment, No showing when the 8/26 appointment was rescheduled to 9/9, cancelled the 10/21 appointment and failing to show for the 10/25 appointment.

The report further explains that "Ms. [Burdett-]Foster will be expected to keep all medical appointments and schedule those appointments which will allow her to perform the full scope of her job" and that "[a]ny future acts of insubordination will lead to discipline up to and including termination."

Burdett-Foster did not attend her November 1 videostroboscopy appointment and did not return to work at the end of her suspension on November 4, 2011. After fainting at her home on November 1, Burdett-Foster's husband took her to the emergency room, where she was

diagnosed with syncope (temporary loss of consciousness caused by temporary decrease in blood flow to the brain), depression, and dehydration and discharged about four and a half hours later. Burdett-Foster called in an STD claim and was eventually granted leave until January 10, 2012.

Both before she was granted this second STD leave and while she was on the first leave, CompOne requested that Burdett-Foster complete her speech therapy. Burdett-Foster attended only one speech therapy session, on December 29, 2011, because her insurance company denied authorization. CompOne also asked about the status of Burdett-Foster's fitness-for-duty examination, particularly the videostroboscopy. Eventually, around December 21, 2011, CompOne confirmed with her treating psychiatrist, Dr. Tariq Abbasi, that Burdett-Foster was stable enough to undergo videostroboscopy and notified Burdett-Foster. On December 27, 2011, Burdett-Foster emailed Mary Kay Mitchell, stating: "My speech therapy apt is this Thursday at 11. Due to my religion the videostroboscopy isn't scheduled as this is against my religion." This statement was the first time she mentioned any religious conflict.

After learning that videostroboscopy violated Burdett-Foster's religious beliefs, a BCN HR Representative, Ursulla McWhorter, requested via email, regular mail, and certified mail sent on December 27, 2011, to meet "to discuss this issue so that we can talk to you directly and have a clear understanding regarding your concerns." McWhorter asked to meet at the BCN Human Resources Office at Burdett-Foster's convenience sometime on or before January 4, 2012.

After Burdett-Foster emailed on December 30, 2011 to say that she would meet with McWhorter once she returned to work on January 11, McWhorter requested that Burdett-Foster "send me an explanation in writing about your concerns as to how your religion impacts your ability to schedule and/or attend a videostroboscopy. I need this information no later than close of business, Wednesday, January 11, 2012." Burdett-Foster did not respond to this request.

When McWhorter met with her on January 11, Burdett-Foster declined to explain her religious objections, stating that it was a private issue: "I would rather not discuss what my religion is as that is my privacy. I do not want to disclose and explain it."

After this exchange, Burdett-Foster received another five-day disciplinary suspension for insubordination. She refused to sign the disciplinary report, which stated:

> Over the past several months Shemelia Burdett-Foster has failed to keep medical appointments that have been scheduled for her through CompOne. Ms. Burdett-Foster has been very deliberately insubordinate by rescheduling, canceling and/or not appearing for numerous medical appointments that have been rescheduled for her by HR and CompOne. In October, 2011, Shemelia received a disciplinary suspension due to insubordination over the same issue. She now continues to be insubordinate by refusing to disclose her reason(s) for not scheduling or taking the videostroboscopy that is required based on her fit-for-duty evaluation. Shemelia's job requires that she speak on the telephone and make outbound calls. The videostroboscopy is required by the fit-for-duty doctor to help determine the cause of her vocal problems. Shemelia has been told on several occasions by both ER/LR and CompOne that she must have this test completed before returning to work. Shemelia has stated she cannot take this test due to religious reasons; however she refuses to discuss her religious reasons for not taking the test. It has been explained to her that this information is needed so that the company can determine if it is possible to make accommodations for her based on her situation. On 1-11-12 when asked whether she would take the videostroboscopy, Shemelia again refused based on her religion and stated she did not want to discuss or disclose this information.

Burdett-Foster was required to return to work on January 18, 2012 and was "expected to complete the fit-for-duty requirements and have a videostroboscopy before she returns to work."

On January 17, 2012, Burdett-Foster met with her therapist, Janice McCrary. That evening, McCrary faxed progress notes to CompOne R.N. Mary Kay Mitchell, stating that during the psychotherapy session that day, Burdett-Foster exhibited suicidal ideation and had a panic attack. McCrary's notes further state that she referred Burdett-Foster to intensive therapy, three times a week and "suggest not to return to work." On the fax cover sheet to R.N. Mitchell, McCrary wrote "will fax Dr. Abassi notes again on 1-19-12 when he will be back in office. Will

call you in the am." Burdett-Foster, however, neither asked for nor received additional STD

leave and presented no evidence that Dr. Abassi's notes were faxed.

On January 26, 2012, BCN terminated Burdett-Foster's employment. In the termination

letter, McWhorter explained:

> Our records indicate you have been absent from work since January 18, 2012
> through today and you have not returned after serving an unpaid suspension from
> January 11 through January 17, 2012 for Insubordination. Further, you have
> failed to personally notify management of the reason for your unscheduled
> absence.
>
> Therefore, this is to inform you that your employment with the company has been
> terminated effective today, January 26, 2012 in compliance with the Master Labor
> Agreement (MLA), Loss of Seniority, Article 8.11. The applicable MLA
> language is as follows:
>
>> *"Employees shall lose their seniority and employment rights if: The
>> employee is absent for three (3) consecutive working days without
>> properly notifying the Company of the reasons for such absence, unless it
>> was not reasonably possible to do."*

II.

Burdett-Foster filed a charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC"). The EEOC was "unable to conclude that the information obtained

establishes violations of the statutes" and issued a right-to-sue letter on June 25, 2012. On

September 26, 2012, Burdett-Foster filed an initial pro se complaint with the United States

District Court for the Eastern District of Michigan. After securing counsel, she amended her

complaint twice. Burdett-Foster's second amended complaint brought the following claims:

(I) "Racial Discrimination In Violation of Title VII Of The Civil Rights Act Of 1964";

(II) "Racial Discrimination Under The Elliot-Larsen Civil Rights Act"; (III) "Retaliation"; and

(IV) "Unlawful Discrimination And Hostile Work Environment Under The ADA."

The original discovery deadline was set for June 13, 2013, but at the parties' mutual request, the district court extended it to August 12, 2013. At Burdett-Foster's request and over BCBS's objection, the district court again extended the deadline until December 17, 2013. Burdett-Foster did not, however, request the modification of any other dates on the scheduling order. Pursuant to the scheduling order, BCBS moved for summary judgment on September 12, 2013. After securing a two-week extension, Burdett-Foster filed her response on October 17, 2013. Burdett-Foster voluntarily dismissed her race-discrimination claims under Title VII and Michigan's Elliot-Larsen Civil Rights Act but argued that genuine issues of material fact remained for her other claims.

Although the district court had set a November 20, 2013 hearing on dispositive motions, it cancelled this hearing, granted BCBS's motion for summary judgment, and dismissed the case on November 14. The district court determined that Burdett-Foster's ADA and retaliation claims failed as a matter of law because she could neither establish a prima facie case for any of her claims nor produce evidence indicating that BCBS's legitimate, nondiscriminatory reasons for terminating her employment were pretext for a discriminatory or retaliatory motive. Burdett-Foster timely appealed.

## III.

We review de novo a district court's grant of summary judgment using the *Matsushita-Anderson-Celotex* standard. *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012). Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We view facts in the record and reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986). We do not weigh evidence, assess credibility of witnesses, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The party requesting summary judgment bears an initial burden of demonstrating that no genuine issue of material fact exists, which it must discharge by producing evidence to demonstrate the absence of a genuine issue of material fact or "by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986) (internal quotation marks omitted). If the moving party satisfies this burden, the nonmoving party may not "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing Fed. R. Civ. P. 56; *Matsushita*, 475 U.S. at 586). A party asserting a genuine issue of material fact must support this argument either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Evidence that is "merely colorable" or "not significantly probative" is insufficient. *Anderson*, 477 U.S. at 248-52. If there are no disputed, material facts, we review de novo whether the district court properly applied the substantive law. *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2003).

IV.

On appeal, Burdett-Foster argues that summary judgment was inappropriate because: (1) the district court generally erred by assuming the role of the jury and making credibility and factual determinations in violation of Fed. R. Civ. P. 56(c); (2) she submitted sufficient evidence to generate genuine issues of material fact regarding her discrimination, retaliation, and hostile work environment claims under the ADA, particularly when considerable discovery was yet to

take place and without oral argument; and (3) she submitted sufficient evidence of a genuine

issues of material fact regarding her race-based Title VII retaliation claim such that summary

judgment was inappropriate.

A.

Burdett-Foster alleges that BCN denied her reasonable accommodations in violation of

the ADA. The ADA makes it unlawful for an employer to "discriminate against a qualified

individual on the basis of a disability." 42 U.S.C. § 12112(a) (2012). The statute defines

"discriminate" to include "not making reasonable accommodation to the known

physical . . . limitations of an otherwise qualified individual with a disability" unless the

employer "can demonstrate that the accommodation would impose an undue hardship."

§ 12112(b)(5)(A). An "otherwise qualified individual" is one who "with or without reasonable

accommodation, can perform the essential functions of the employment position that such

individual holds or desires." § 12111(8).

"Where, as here, the plaintiff seeks to establish discrimination through indirect, rather

than direct, evidence, we require the plaintiff to establish a prima facie case, followed by the

familiar *McDonnell Douglas* burden-shifting." *Talley v. Family Dollar Stores of Ohio, Inc.*,

542 F.3d 1099, 1105 (6th Cir. 2008). A prima facie failure-to-accommodate case requires a

plaintiff to show that: (1) she is disabled under the meaning of the ADA; (2) she is otherwise

qualified; (3) the employer knew or had reason to know of her disability; (4) she requested an

accommodation; and (5) the employer failed to provide the necessary accommodation. *E.g.*,

*Dicarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004) (quoting *Gaines v. Runyon,* 107 F.3d 1171,

1175-76 (6th Cir. 1997)). "The employee also bears the burden of proposing reasonable

accommodations; an employee's claim must be dismissed if the employee fails to identify and

request such reasonable accommodations." *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 983 (6th Cir. 2011) (citing *Tubbs v. Formica Corp.*, 107 F. App'x 485, 488-89 (6th Cir. 2004)). Once a plaintiff establishes a prima facie case, the defendant bears the burden of demonstrating that any particular accommodation would impose an undue hardship on the employer. *See DiCarlo*, 358 F.3d at 419.

Burdett-Foster testified that her disabilities were depression, hypertension, and migraines; she did not list her vocal cord issues as a disability. Assuming that these constitute disabilities under the ADA, that she was otherwise qualified for her position, and that BCN knew of these disabilities, Burdett-Foster's failure-to-accommodate claim nonetheless fails because, by her own admission, she did not ask for any accommodations aside from being able to make frequent trips to the bathroom, which BCN permitted. The only additional accommodation Burdett-Foster perhaps requested was that she remain in the same department but report to a different supervisor—a request that BCN denied because of her seniority level. Burdett-Foster does not specifically tie this request to any of her disabilities; rather, she asserts that she wanted to avoid general harassment, which seems to link to her depression.

"Personality conflicts, workplace stress, and being unable to work with a particular person or persons do not rise to the level of a 'disability' or inability to work for purposes of the ADA." *Fricke v. E.I Dupont Co.*, 219 F. App'x 384, 389 (6th Cir. 2007) (citing *Weiler v. Household Fin. Corp.,* 101 F.3d 519, 524-25 (7th Cir. 1996)). Even if Burdett-Foster had requested a transfer to a new position (and she made clear in her deposition that she had not), such an accommodation is reasonable only if there is another position for which she would have been qualified. *See Coulson v. The Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 857 (6th Cir. 2002) (citing *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000)). Undisputed

evidence in the record, however, indicates that Burdett-Foster was not qualified for any other positions that were open at the time.

Burdett-Foster claims that her depression was not accommodated because she was harassed based on the number of bathroom breaks her blood-pressure medication required her to take. Assuming that the harassing behavior that Burdett-Foster identifies—BCN's contemplating but not actually requesting a second opinion, BCN's assessing whether four to five breaks per hour left enough time for Burdett-Foster to perform her work, and a supervisor's monitoring her bathroom use—are true, this behavior does not amount to a failure to accommodate. Burdett-Foster does not allege that BCN or any of its employees actually said or did anything to discourage or prevent her frequent use of the bathroom. Rather, the record demonstrates that BCN accommodated Burdett-Foster and permitted her to use the bathroom as much as necessary.

Accordingly, the district court properly granted summary judgment on Burdett-Foster's failure-to-accommodate claim.

B.

Burdett-Foster also contends that BCN discriminated against her because of her disability in violation of the ADA. To establish this claim, Burdett-Foster must first present prima facie evidence that: (1) she is disabled; (2) she is otherwise qualified; (3) she suffered an adverse employment action; (4) her employer knew or had reason to know of her disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 314-17, 321 (6th Cir. 2012) (en banc). If Burdett-Foster can establish a prima facie case, then the burden shifts to BCBS to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *E.g.*, *Plant*

*v. Morton Int'l, Inc.,* 212 F.3d 929, 936 (6th Cir. 2000). If BCBS does so, then Burdett-Foster would bear the burden of proving that BCBS's proffered reason is a pretext for unlawful discrimination. *Id.*

Burdett-Foster argues that there are genuine issues of material fact as to whether BCBS discriminated against her by first not allowing her time to "get [herself] situated with [her] depression," and then by terminating her because of her disability. Presumably, Burdett-Foster's first contention is one of failure-to-accommodate. As discussed above, the record unequivocally indicates that BCN allowed her to go on STD leave for her depression twice.

Assuming that Burdett-Foster makes a prima facie showing of disability discrimination based on BCN's terminating her employment, BCBS offered a legitimate, nondiscriminatory reason for Burdett-Fosters' termination: her seven-day consecutive unexcused absences. *See generally Walborn v. Erie Cnty. Care Facility*, 150 F.3d 584, 589 (6th Cir. 1998) ("[A]n employee's work violations constitute a legitimate, non-discriminatory reason for adverse employment decisions."). Because Burdett-Foster had been absent for more than three days, her termination complied with the Master Labor Agreement between BCBS and the UAW. Moreover, Burdett-Foster testified that she did not know of any individuals—disabled or not— who had failed to report to work for more than three days and were not fired; conversely, Burdett-Foster knew of a nondisabled employee who had been terminated for failing to come to work. Burdett-Foster also admitted that she could not point to any nondisabled persons who had been treated more favorably than she had.

Because BCBS articulated a legitimate nondiscriminatory reason for its action, Burdett-Foster bears the burden of proving that this proffered reason for her termination is actually pretext for prohibited discrimination. To prove pretext, a plaintiff must show "that the proffered

reason either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009). Burdett-Foster does not specify the basis on which she attempts to prove pretext; rather, she offers three pieces of evidence which she claims create genuine disputes of material fact regarding pretext such that summary judgment was inappropriate.

Burdett-Foster first contends that she was given two return-to-work dates after her second suspension—January 18, 2012 and January 21, 2012—and that these competing dates indicate pretext. Our review of the record—including Burdett-Foster's record citations—does not support her claim that she was given two different dates; rather, the record indicates that BCN told her to return to work on January 18. Moreover, even if she had been given competing dates, her pretext argument is unavailing. If Burdett-Foster was supposed to return to work on January 21, she still would have been absent for three consecutive work days (January 24 through January 26), and BCBS thus still had justification to fire her.

Burdett-Foster next attempts to prove pretext by arguing that BCN ignored "disabling paperwork filed by her doctor to extend her disability." Again, this contention is wholly unsupported by the record. The only evidence Burdett-Foster offers is a January 17 note from her counselor which states "suggest not to return to work." Neither Burdett-Foster nor her doctor provided any notice that Burdett-Foster needed a leave of absence beginning on January 18, 2012, and the vague note from her counselor does not constitute "disabling paperwork." Moreover, Burdett-Foster did not submit a request to extend her STD leave. Accordingly, this note does not provide sufficient evidence of pretext to withstand summary judgment.

Finally, Burdett-Foster offers BCN's "ordering a 'fit for duty' examination during a disability and which, under the circumstances, was not related to her duty and thus not allowed"

as evidence of pretext. Burdett-Foster, however, offers no evidence to support her statement that providing backup telephone support was not part of her job duties. Instead, the record demonstrates that her department, including her more senior coworkers, performed backup telephone work. BCN initially accommodated Burdett-Foster when she said she was unable to complete training. After over a month without improvement, BCN's request for a fitness-for-duty exam to assess Burdett-Foster's condition does not suggest pretext.

Burdett-Foster continues to claim that BCN's terminating her based on her absences was actually pretext for firing her because of her disability, but she does not support this contention with evidence from the record. Bare allegations that disputes of material fact exist are insufficient to withstand summary judgment. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 248-52. Accordingly, the district court did not err in granting summary judgment on her ADA-discrimination claim.

C.

Although Burdett-Foster's Statement of the Issues mentions retaliation under both the ADA and Title VII, the substance of her argument only addresses Title VII retaliation. Accordingly, we review only her Title VII retaliation claim. A plaintiff may prove retaliation using either direct or circumstantial evidence, and we assess claims relying on circumstantial evidence using the *McDonnell Douglas* burden-shifting framework. *E.g.*, *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010).

To make a prima facie retaliation claim, "a plaintiff must establish that (1) she engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Mengelkamp*

*v. Lake Metro. Hous. Auth.*, 549 F. App'x 323, 330 (6th Cir. 2013) (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)). A plaintiff must show that a reasonable employee would have found the employer's action materially adverse—*i.e.*, that a reasonable employee would have been dissuaded from making or supporting a discrimination claim. *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68 (2006). Moreover, a plaintiff must prove that the protected activity was a "significant factor" in the adverse action. *See Polk v. Yellow Freight Sys.,* 876 F.2d 527, 531 (6th Cir. 1989) (quoting *Taylor v. GMC,* 826 F.2d 452, 456 (6th Cir. 1987)). To establish that the protected activity was a significant factor, the plaintiff must show that the activity was one of the reasons for the defendant's actions. *Polk,* 876 F.2d at 531. If the plaintiff makes a prima facie case, the burden then shifts to defendant to "provide a legitimate, nondiscriminatory reason" for its actions. *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 879 (6th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the employer provides a nondiscriminatory reason for its actions, the burden shifts back to the plaintiff to show that the decision was pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804-05.

In November or December 2010, Gibson remarked at a work function at which Burdett-Foster was present that he was the "head n***** in charge." Burdett-Foster contends that after she complained to HR and the Union about Gibson's remark, he and her direct supervisor, Albert Walgenbach, began harassing her and mistreating her. Burdett-Foster testified that Walgenbach peered at her from around corners, followed her to the bathroom and waited outside with his arms folded on a daily basis, listened to her phone conversations, and falsified her production records. Burdett-Foster eventually asked Walgenbach to stop following her; he said nothing in response and continued to follow her.

As to Gibson, Burdett-Foster maintains that he yelled at her a number of times, while not treating other subordinates that way. Human Resources investigated Gibson's alleged harassment complaint but could not substantiate it. In December 2011, after having heard from HR regarding her first complaint, Burdett-Foster filed another substantially similar complaint. Burdett-Foster alleges that she was further harassed and eventually terminated in retaliation for this complaint. Assuming that this complaint coupled with her eventual termination satisfies the first three elements of a Title VII retaliation claim, the fourth element, causation, is problematic for Burdett-Foster.

To support her retaliation claim, Burdett-Foster makes sweeping statements such as "emails between Gibson, Comp One and other of Defendant's management clearly demonstrate that Gibson was more than eager to be rid of the Plaintiff, despite almost a dozen years of good work performance on her part. Eager, either because she had complained of his treatment of her and his racial remark . . . ." A review of these emails does not substantiate Burdett-Foster's claim that she was harassed in response to her having lodged a complaint. Despite robust correspondence with BCN, Burdett-Foster never mentioned any incidents with Gibson or other supervisors.

Turning to Burdett-Foster's claim that her termination itself was retaliatory, the seven months between her initial complaint and her termination tend to cut against her argument. Temporal proximity alone does not necessarily imply causation. *See, e.g.*, *Chandler v. Specialty Tires of Am. (Tenn.), Inc.*, 283 F.3d 818, 826 (6th Cir. 2002). We have held that a four-month gap between the protected conduct and alleged retaliation was too long to support an inference of retaliation. *See Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 550 (6th Cir. 2008) (citing *Cooper v. North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986)). Burdett-Foster points to no

evidence indicating that BCN's reason for terminating her was retaliation for her complaint, rather than a response to days of work she missed without explanation. Accordingly, the district court did not err in granting summary judgment on her retaliation claim.

V.

Finally, Burdett-Foster argues that the district court erred by granting BCBS's motion for summary judgment before the close of the extended discovery period and without first holding a hearing. But, as she acknowledges, due process does not always require oral argument. *See FCC v. WJR, Goodwill Station*, 337 U.S. 265, 275-76 (1949).

Turning to her discovery argument, Burdett-Foster maintains that additional discovery was necessary to clarify certain issues of disputed fact. Federal Rule of Civil Procedure 56(b) states that "[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Per the district court's scheduling order—which, unlike the discovery deadline, had not been modified—BCBS timely filed its motion for summary judgment on September 12, 2013. Fed. R. Civ. P. 56(d)[1] provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) give an opportunity to properly support or address the fact; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Here, however, Burdett-Foster did not trigger Rule 56(d) because she did not file an affidavit or declaration explaining why she could not present facts that were essential to oppose BCBS's motion, what those facts were, or why they had not been previously discovered. Accordingly, we decline to review this issue. *See Plott v. General Motors Corp.*, 71 F.3d 1190, 1196 (6th Cir. 1995)

---

[1] The substance of Rule 56(d) appeared as Rule 56(f) before the 2010 amendments to the Federal Rules of Civil Procedure, and throughout her brief, Burdett-Foster refers to Rule 56(f) instead of 56(d).

(explaining that without an affidavit or a motion that gives the district court a chance to rule on the need for additional discovery, this Court will not address whether there had been adequate time for discovery).

VI.

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment in favor of BCBS.